Case 13-5341, Charles Hocker v. Pikeville City Police Dept, et al, oral argument, 15 minutes per side, Mr. Pearson for the appellant. And I want to make sure that the court is clear with respect to the factual findings of the district court. We've raised two issues on appeal. The first has to do with the fact that facts in the context of qualified immunity must be viewed in a light most favorable to the plaintiff when we're determining whether or not qualified immunity exists. That absolutely did not happen here. This court has also held that the failure to do that constitutes reversible error. And perhaps the best case as to that issue is Huckabee v. Priest. In that case, it was a finding of qualified immunity. This court specifically said that... What are some of the facts that you're concerned the government or the district court was assuming against your client? Essentially all of them, Your Honor. Well, give me a top three or four list. And if they're good, I'll be interested. If they're not so good, I might not be interested after that. Are we an eyewitness to the fact that after the police shot my client? Okay, so yes. When I read your brief, the first time I read your brief, I go, oh my gosh. Because you relied on some of the statements from this woman's deposition that really did seem problematic. But then I learned, oh, well, wait, she qualified some of this later in the deposition. She did. Okay, so the way the inference thing goes is you don't get to take your witnesses, and when they say two different things, you get to pick the best one. Well, we didn't have two witnesses here. What's that? We didn't have two witnesses here. We had Mr. Hocker, who... No, I'm saying if there... We have this one woman. That's the woman you're talking about. Correct. And she's making... Ms. Mead, right? Ms. Mead, yes. And you're making her observations about what happened and getting him out of the car. Correct. Okay? And in your brief, you highlight some of the things she says that I think are disturbing. But it doesn't acknowledge the stuff she later qualifies in the deposition. Oh, well, okay, I guess I couldn't see that. And I think the only verb left that has some anxiety, some problematic components to it is the verb hitting. That's all that's left after further cross-examination in the deposition. Well, and she also... We also had the photographic evidence that was never... The court was never able to even view that. And those pictures we submitted to this court that show blood splatter all over the officer's shoes and the bottoms of their pant legs, after they claimed that they shot this guy nine times, some of those gunshots went into his chest. They tried to give CPR, yet they had not a speck of blood on their actual clothing and had blood splatter all over their shoes. Now that... What does that show? The kicking portion. Because Ms. Mead also testified that she thought that she saw them kicking him as well. And then we had the photographs of his neck showing the bruising. Okay, but the kicking, I thought she qualified that one away. She didn't. She didn't, no. Okay. No. But in addition to Ms. Mead, there was the expert, our expert witness, who was a former Kentucky State Police Commissioner, who testified that based on his review of the evidence, this act was not justified. This act was a plain violation and was plainly excessive. And even Captain Pruitt, the defendant's own witness... Was the expert's perspective about the constitutionality of it, or was the expert's perspective about whether they were following police policy? Whether they were justified in doing it. Whether they followed police policy and whether they would have been justified in the constitutional context as well. He focused primarily on the fact that the gunshots in this case, every single bullet hole was in the side of the vehicle. The officers at that point were by definition out of harm's way of the vehicle. And this court has repeatedly held... There's three separate cases where this court has said, when you're firing into the side of a moving vehicle, you are by definition out of harm's way. There are very, very, very narrow and rare instances in which you may use deadly force to apprehend even a fleeing felon. And in this case, in all of those cases, the court said, when you're firing into the side of a vehicle, you're not in harm's way. You're not in the path of that vehicle. So is your theory that all of the shots... So you've got this backing up, okay? Correct. They get out of the way. Is your theory that all the shots were fired after the backing up and while the car was at rest? Or is your theory that, well, some were fired then, but then the car was moving and leaving on its way out? No. What happened here is Hocker backed his vehicle up. He hit the police cruiser. Officer Branham was out of the way. Officer Branham had already posted up to the side of the vehicle. I thought Branham said he had to push himself off of the car. That was Bayston. Because they were in two separate vehicles. Branham was already out of the way, 10 to 15 feet to the left, to the driver's side, fired eight times, got eight shots off before Bayston... I just want to be clear, because are you saying that I read it in both places, but the red brief says Officer Branham moved back as it was being pushed rearward, placing his left arm on Bayston's car to keep the car off of him. Off of him. Okay, then that might be my mistake. They're both Bayston and Branham. I might be talking about Bayston. And in that sense, they're both behind Hocker's car. No, Officer Bayston was actually to the left. He was not behind. He was to the side and to the left. Well, if he's pushing off of the other officer's car, he'd have to be behind Hocker's in some respect. No, that's Branham. And Bayston's behind the door of his car. Right, and that's the only issue. And that is still a question of fact. Why is that a question of fact? Because he claimed that he had his arm trapped momentarily. Yeah, but there's no contradictory evidence on that. So why is it an issue of fact as to what was going on there? What's the disputed issue of fact as to that point? He testified, here's where I was. I was pinned. It's backing up. You have to accept that. But the fact of the matter was that when he fired his weapon, he was out of the way of the vehicle. That's the issue of fact there. Even if he was pinned momentarily, when he got off his shots, he still rolled to the side of the vehicle and shot. So the guys come at you once and you get away from them and you say, okay, King's X. Exactly. Even if he's still in control of the car? He wasn't, though. He had been shot at that point. Wait a minute. You're talking about the first shooting. As I understood it, you said once he's to the side of the car, even though he's just hit your car. As I say, time out. Let him roll. You don't get to still shoot him at that point. That's the problem here is once the officers are out of harm's way, they don't get to shoot. Were there any shots fired after Hawker's vehicle stopped, was clearly stopped? We don't know that. What's your theory? What's your theory of what happened? You want us to read the inferences your way. Oh, sure. Just hear me out. The car backs up. It hits the cruiser. You're saying no shots are fired until after it hits the cruiser. Is that your theory? That's correct. Okay. And then is your theory that all of the shots are fired while it's just stopped there? It hasn't started moving again? No, the car is moving, but the point is that. So it's starting to leave. No, Hawker's vehicle is touching. It's like this. He's backing up, right? Both officers get out of the way, and they shoot him from the side of the vehicle. They didn't have the right to use deadly force at that point, period. Stop. You're still losing me on this. I'm trying to figure out all of the shooting is after his car hits the officer's car. This is correct, yes. Okay. So just answer this question. Are all the shots fired while Hawker's vehicle is still, or does Hawker's vehicle start to move away? It didn't move anywhere. It's moving backwards still. The vehicle is still moving backwards. Their theory was that Hawker was trying to push the cruiser backwards in a little Honda Prelude, and that he. . . So I see what you're saying. It had hit the car, but it was still moving in the same direction. Exactly. And all the shots are fired. So what's your theory? Is your theory that the cars had stopped and the shots were fired, or is your theory, in fact, it's true, the Hawker vehicle was still moving backward as the shots were fired? It had to have been moving backward. It was still moving backward, and we don't know if that was because they fired the first two shots and Hawker passed out. Okay, so from the police officer's perspective, all they see. . . They don't know about this 4,000 rpm problem with the car. They're not supposed to know that. All they know is this thing rammed them. They've been at the end of this long chase. The car is still backing up. It's still moving. He's still in the car. They're not allowed to fire shots? They are not, no. They are not under established Sixth Circuit case law. They're not under their own department policy, which their police captain admitted at his own deposition. He said that if they were out of harm's way, if they were out of the vehicle's path when they began firing. . . If you're out of harm's way and out of the immediate path of the way a car is moving at that moment when you have no idea whether it can come at you again. . . Well, and that's the point of the case law is that . . . And what's your best case that says you're out of harm's way if you're not directly in the path that moment? Kirby v. Duva and then Sigley v. City of Parma Heights. And in both of those cases, the officers were behind the vehicle. One of them actually fell down into a ditch. And this court focused on the fact that no shots were fired. . . I remember Duva. I think I was on that one. He fell into a ditch, but it's like off the side of the road. Right. And the court focused on the fact that there were no shots that were fired into the back of the vehicle. He wasn't in . . . The Standards Act actually . . . What about the fact that each officer testified they didn't know where the other officer was? That is true, but the problem with that statement is that Officer Basden was off into the side and he was forward of Branham. He would have had no reason to suspect that the other officer was behind him and was in any harm to begin with because they had both exited their vehicle at that point. I guess I'm just not following it. If they didn't know where each other was . . . They still . . . Okay, just . . . And then we know as a fact that one of them was pinned and very much at peril for a moment. They're not allowed to be doing something to protect the other officer when they don't know where the other officer is? They're not allowed to shoot the gentleman. They could have taken out the tires. He could have looked behind him to see where the other officer was. There's no evidence that he even bothered to look. He got out of his vehicle and began shooting. That's the problem here. We're talking about a human being's life, and you don't get to just kill that person because you suspect that possibly, maybe, they might come after you with a vehicle or somebody else is in harm's way. You have at least a duty to turn your head and look, and he didn't do that here. Okay, counsel, I think your time's expired if you want to save your rebuttal time. You'll have five minutes for rebuttals. May it please the Court, my name is Russell Davis. I represent the city of Pikeville. They're a police department, an officer base, and an officer brand. The city of Pikeville is a small city over in eastern Kentucky. We border West Virginia and Virginia, a town of 6,000. But our officers, and we have about 15 at any time, our officers are all trained like all law enforcement officers in Kentucky. We go to the State's Academy in Richmond, Kentucky, and these two officers went to the Academy and tended to get their trainings. I didn't want to leave the impression that these are young officers that are untrained. You know, to me, this case really doesn't turn on any particular cases. You guys know that there are a whole lot of cases on police shooting and deadly force. A lot of different facts to look at, a lot of different cases. This is really, in my mind, where Mr. Hawker takes individual series of facts and pieces of them together to fix the story that he likes. He talks about the human rights and human life and sanctity of that, but he ignores the officers, the danger and the peril that he put them in. If you believe his version that he knew none of this was going on, he didn't know the police officers were following him, that's his claim, but that's really not believable. But going back through some of the facts that have already been addressed is you guys, Judge Boggs, you hit it right on the point when you noticed that Bayston, he clearly did. He was the officer that had to, with his left hand, keep this Crown Vic cruiser off of him. And with his right hand, his weapon, he testified, I'm pushing off and I'm getting away to fire at the vehicle. And because he was stepping around the vehicle, he does tag the driver's side of Hawker's car. But now Hawker had come to a stop, it's on a grassy hill, late at night in a dark field that these officers had never been. The grass was wet, you could see from the photographs post-accident. Was this a rural area? Very rural area. Why were there two people? It just seems so random that there were two people just waiting for this event. Two officers? No, no, just me and the other guy with the camera. Were they following the radio station or something? How did they all arrive? Mrs. May just said she was driving home and stops on the roadway. I have put the maps, the maps are in the file. We took an aerial map and I asked her, draw where you saw the cars. Number one, she said she only saw one cruiser. Undisputedly, there were two cruisers. She said that they were two car lengths off of the main highway where she was. It's undisputed. The photographs show it, the aerial map. They were maybe 100 feet up this gravel road off the main highway, so she would have had to see in the dark 100 feet. Then you had two cruisers she had to look over, and then Hawker's car was turned to where the driver's side would be away from her. Judge Boggs was obviously looking at my brief when we go through what Mrs. Meade actually says. She says, I see all this feet and hand action. Well, the officers testified that even after they had shot into Mr. Hawker's car, they weren't sure they hit him, but they opened the door, told him to get out, wouldn't get out, holding on the steering wheel, they still had to jerk him out of the car. What Mrs. Meade saw, if she saw anything, was probably the officers jerking Mr. Hawker out of the car and taking him to the ground where they initially put handcuffs on him and then observed that he had been shot. The actual shooting itself, when Hawker slams the gas of the car, and you can see in the grass black marks from the front-wheel drive condor prelude where it scratches off in reverse. You can see in the dewy grass the tracks where he kind of circles back towards the officers. That car is kind of out of control coming back. He comes back, according to the state police detective that investigated, he comes back about 30 feet, he strikes the Crown Vic automobile, and he pushes a Crown Vic police cruiser back 30 feet into the ditch line. And this is when the officers are shooting at him, it's when they're trying to get away from the cruiser, each of them. So you agree all the shots were fired while it was still being pushed backwards? Yes, there was absolutely no evidence that any shots were fired after the cruiser stopped. In fact, both officers testified, we basically fired until the cruiser quit moving and he had let off of the gas, until the momentum of the cruiser stopped. But what they had also said was that Officer Basden, he's in a defensive position between the door of his car and the cruiser. When his cruiser struck, he's actually knocked down, he thinks he falls under the open car door and it goes by him. When he gets up and starts shooting, he testified that he did so because Officer Branham, the last time he saw Officer Branham, he was behind his cruiser. And he thought Officer Branham was in peril because the cruiser was still being pushed back by Hawker slamming the gas to it. Officer Branham said he fired to protect himself and he said when he last saw Officer Basden, he was between the door of the cruiser and was being knocked down was the last time he saw him. Again, it's pitch black dark out there in this grassy field. They testified that they didn't know when he was going to stop. And then even Judge Adkins, in his opinion, went further to say, how do these guys know or appreciate that after he quits going in reverse, he's not going to put it in forward and continuous escape and maybe run over the officers. So I think the evidence is clear that they were never out of harm's way. Now they make a big deal about the bullet holes in the car and it being in the side. But my point about their expert, they never had an expert that said, well, those bullet hole patterns mean anything particular. The officers didn't know what they meant. Isn't it pretty obvious if all the bullet holes are in the side door that they were shooting from the side? You don't need an expert for that, do you? I agree with that, but then what angle because you could look at the bullet holes in the car and some of them appear to me, as not an expert, that they could have possibly been a straight .45. Others look at angles, like if the car was sliding backwards this way, it looked like their angle was in that way. But they all went through the side door? All of them are in the side of the car. So impacting the side does not necessarily mean perpendicular to the side, is what you're saying? It doesn't mean that they were perpendicular. The officers testified in their view the car is coming back towards them in reverse. It's because it's on wet grass and it's a little bit uphill coming back down the hill that was sliding. Basically the argument is whether the only place that's in harm's way is the exact 180 degree line directly behind the car or harm's way is a bit bigger than that. Yes, I think that's the argument. They want to take these two officers that are paid less than $30,000 a year and say, guys, you just stand there and that car will go right by you. I want to escape from you and if you'll just hold still, I'll slide in this wet, dewy grass, I'll be able to slide right by you. If you look at this case law, the deference is supposed to be given to the officers. They're out there at night, they're out there by themselves in a very rural area. When you say they get deference in the sense that if any reasonable officer could think that it wasn't unconstitutional, they get deference. On the facts, they don't get any deference. We have to take the other side's inferences of the facts. In this case, Mr. Hawker claims he really remembers nothing. As far as him backing up, he says, I'm just sitting there listening to the radio and decide I'm going to put it in reverse and back up. Gosh, I thought I hit a telephone pole and pushes a Crown Vic back 30 feet. Both sides seem to find it remarkable that the prelude could push the Crown Vic. I guess they seem to think it really didn't happen. You seem to think it's a sign of what? Of the force of how Hawker was trying to escape. It was, and I just put it in reverse. So a little guy going fast can push a big guy going standing still. You take a little car, and he had a downhill run. So he's on the uphill side. He's on the uphill side. He gives the gas hard, and it was a gravel road. Maybe it's easier to push a vehicle on a gravel road back 30 foot. I'm not really sure if they believe that the officer left the car in maybe neutral. I'm not really sure what their argument, but it's really undisputed from the Kentucky State Police's investigation that the automobile was struck and pushed back 30 feet. You say the backing up was part of the escape. That's not part of the escape. If you're escaping, you go forward and leave. You don't ram them. He was trapped. He had gone up a gravel road. The gravel ended, and then it was a grassy hill. He went and spun out. So for him to escape, he couldn't go forward anymore. To escape, he had to back up. He's got to push them out of the way and then maybe do a U-ey or something. Exactly. Is that true that he couldn't have gotten out except by pushing them out of the way? Only by pushing them out. There was a gravel road. You said a gravel road, but it's not like the gravel road is going all the way to hazard. Oh, no, no, no. It was just a gravel road leading up kind of a farmy area, and the gravel just ran out. There was a ditch line to the left of the roadway that the cruiser got pushed into. The other thing is, over on the right side, there was a rock wall. So it would be really tough the way the position the two cruisers took up. He might have, in the daylight, if you could see well, you might have been able to maneuver around, but probably at night, his only option. But there's clearly no exit just by hitting the gas and going forward. Yeah, no exit forward. He had to go back out the way he came. The only way he could have escaped was back out the same gravel road to the main highway. So that's a lot like Smith v. Freeland where the guy's caught in the cul-de-sac and he's got to come back out around the cars. Exactly. Remember that case? And the Smith v. Freeland I had written down here. But you know, all this suggests that he wasn't trying to hurt the officers. Hawker suggested that? No. All of this suggests that he was not trying to hurt the officers. In other words, you're making it seem pretty clear to me that everyone looking at this would have realized he's not trying to hurt anybody. He's just trying to get out, and the only way to get out is to ram the vehicles. There's no risk, in other words, that once he's hit the vehicles, he's going to turn around and come back at them. He's just trying to create an escape valve. So that seems to undermine a little bit some of your theory of the case, which is that this guy's suicidal, he's actually trying to hurt the officers. I don't think he is. I think he's trying to get the car out of the way so he can get out. I mean, I don't think there's any evidence really what his intention was. You just told me. You just told us. You know, I don't know. If you're trying to escape and your method of escaping is to back into a police cruiser with the police officer behind the door of that cruiser, I may not intend on hurting that officer, but I'm going to get charged with a crime. And, you know, that's the other part about this. He was charged with two counts of attempted murder and then indictment, and he pled guilty to one endangerment and accepted something like eight years. So he may not have intended to hurt that officer, but the simple fact is those officers were behind the car when he chose to ram that car and push it back on him. And Officer Basin actually was, had some minor injury, was taken to the office to be checked out. You know, the other fact is they talked about the blood on their uniform. You know, in the photographs that they show, you could see some blood spots on their shiny patent leather shoes, but the rest of it is navy blue uniforms. I mean, I don't know that you could have seen any blood on that uniform in those particular pictures if there was or was not blood there. But that's basically what I have, unless you guys have any questions. Okay. No, thank you, Counsel. You have your five minutes for rebuttal. I first want to address the factual issues here. You're exactly right, Judge Sutton. If anything, Hocker was trying to escape. This was a residential area. It was a holler. Basically, he turned right. It's a gravel road. It's residential. There's houses all along there. So this isn't just out in the boonies somewhere in the middle of a field. He pulled into a gravel driveway. There's houses all along. His testimony was that he pulled in. He was upset and distracted because he just had a fight with his ex-girlfriend slash baby mama. Pulled over, popped a CD, and cranked the music up really loud, wanted to go somewhere and think. He backed out. He thought he hit a telephone pole. That's his testimony. That's his version of the events. Now, whether or not that's realistic. Isn't his actual intention really irrelevant? We do have to look at it from the point of view of what the officers saw happening. We do. So that evidence that he absolutely intended to kill them or absolutely evidence that he thought he was doing meditation is really irrelevant, isn't it? It's what a reasonable officer would have believed. That's correct. Given the circumstances that the officer was seen at that moment, which is this car coming out. Correct. Even in that instance, an officer is never, ever able to use deadly force to apprehend a fleeing felon. That is a Supreme Court case. But then the question there is fleeing. I mean, in cases like Garner, where that comes from, he's going that way, and I'm over here, and he's going away from me, right? Right. And then the question turns on whether or not the officers were reasonable in believing that they were in danger of immediate physical harm, and that's where the case law comes from in terms of whether or not he was behind it. Or that in some of our cases that the person is a generic threat, right? Yes. Some of our cases are when the person has been doing stuff that is fell, but also is just sufficiently dangerous. The person has been driving recklessly, certainly appears to want to continue driving recklessly. I'm not sure. I don't think I've read cases on that. Scott v. Clay County is pretty much that way, isn't it? They've sort of been leading them on a chase, right? I mean, he's going 100 miles an hour down the back roads and that sort of thing. Isn't that Scott v. Clay County? Even in those instances, though, Your Honor, deadly force is still not justified unless those officers. Scott v. Harris is the case. That's the U.S. Supreme Court. That's the case where they perform this maneuver, which is pretty close to deadly force given what happens to him when he's racing, taking him on this race, and they finally ram his car off the road. Right, but none of those things, that's the problem, is none of those things actually happened here. All we have is police officers chasing this gentleman who they believe is intoxicated, who pulls off. But this proves you can make sure these people don't get back on the road. That's what that proves. Yes, but you can't just shoot them. I mean, he could have taken out the tires. The officers had numerous other ways of ensuring that he didn't get back on the road. That's the second time you've said that, shooting at the tires. Have you ever encountered a police practices expert or instruction manual that has advised a police officer to try to shoot out the tires of a vehicle? I have never encountered that. Other than maybe on television or something. Well, their own manual here advises to use every other available means to get out of the way. Use your firearm and try to hit the tires? Is that in the manual somewhere? I don't believe so, not specifically, no. But the second issue here has to do with the analysis of the city's liability. That was the second issue that we raised in our brief, which we haven't had a chance to discuss. But the plaintiffs in this case conceded that the city was entitled to summary judgment because the city police department was the entity that was responsible for the policies with respect to training. And in analyzing that issue, for some reason, the district court agreed that summary judgment was appropriate but then applied the wrong standards in analyzing official capacity liability. But if there's not a constitutional violation at prong one of the qualified immunity analysis, there's not much to discuss on this. Well, this was a separate issue, though. That was the 1983 claim. This had to do with a negligent failure to train, which is a tort claim. The two are separate, I believe. So you're talking about a state law claim right now, or are you talking about city liability? City liability. Yeah, and I'm just saying to you, if there's no underlying constitutional violation, you don't have a failure to train claim. Don't you agree with that? Now, I know you think, obviously, if that's not true, if you do have a constitutional claim, then we get into this. I'm just trying to make sure I understand when I have to look at your argument. I believe the case law is that you're correct, that if you don't have a 1983 claim, then the negligent failure to train claim, you still consider it. Okay. Sorry, my time's up. Thank you, counsel. Thank you. Time has expired. The case will be submitted. The clerk may call the next case.